```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE EASTERN DISTRICT OF PENNSYLVANIA


JOHN DEWALT, assignee of      :      CIVIL ACTION
BETTY JO GUFFEY, now          :
BETTY JO GUFFEY GOSS          :
                              :
              v.              :
                              :
THE OHIO CASUALTY             :
INSURANCE COMPANY             :      NO. 05-740
```

<u>MEMORANDUM AND ORDER</u>

McLaughlin, J.                          April 10, 2007


      This is a diversity case alleging breach of contract and bad faith against an insurer, The Ohio Casualty Insurance Company, for failing to tender promptly its policy limits.

      Ohio Casualty's insured, Betty Jo Guffey, was the driver of a car involved in a one-car accident that seriously injured three passengers, including the plaintiff, John DeWalt. The accident occurred on July 28, 1998, but Ohio Casualty did not tender its $25,000 policy limits to Mr. DeWalt until September 23, 1999.  At that time, Mr. DeWalt rejected the policy limits and proceeded to trial against Ms. Guffey, eventually winning a verdict against her on August 12, 2003, in excess of $4,000,000, not including delay damages.  After the verdict, Ms. Guffey settled with Mr. DeWalt and assigned him any claims she had against Ohio Casualty.  Mr. DeWalt has brought this action asserting Ms. Guffey's bad faith claims against Ohio Casualty and seeking to recover the unpaid amount of his verdict, $4,247,362.

Ohio Casualty has now moved for summary judgment, contending that its actions in handling Ms. Guffey's claims do not rise to the level of bad faith.

I.   <u>BACKGROUND</u>

The facts here are undisputed.

In the early morning of July 28, 1998, Ms. Guffey was driving a car owned and insured by her father when she ran off the road and hit a tree on S.R. 901 in Mt. Carmel Township, Northumberland County.  Ms. Guffey and the three passengers riding with her, Mr. DeWalt, Megan Swinehart, and Adam Fantini, were seriously injured.  Def. Mot. and Pl. Reply at ¶¶ 6-9.[1]

Ohio Casualty was notified of the accident on July 28, 1998.  Ohio Casualty's claim file indicates that, at that time, Ohio Casualty had been told that Mr. DeWalt had been paralyzed from the neck down and was on a respirator; that Ms. Swinehart had suffered a broken neck and was hospitalized but was "coming along OK"; and that Mr. Fantini had suffered facial injuries, but had been treated and released.  Ex. A to Pl. Br. at 41.

---

[1]   In this Memorandum, the Court will refer to Defendant Ohio Casualty Insurance Company's Motion for Summary Judgement as "Def. Mot."; its Memorandum of Law in support of that Motion as "Def. Br."; and its Reply Brief in support of that Motion as "Def. Rep. Br."  The Court will refer to Plaintiff John DeWalt's Reply to the Defendant's Motion for Summary Judgment as "Pl. Reply" and its Brief in Opposition to the Motion as "Pl. Br."

Ohio Casualty's insurance policy on the Guffey vehicle provided for liability coverage for personal injuries sustained by an occupant of the vehicle in the amount of $25,000 per person and $50,000 per accident.  Def. Mot. and Pl. Reply at ¶ 10.

On September 15, 1998, counsel for Mr. DeWalt wrote Ohio Casualty informing the insurer that Mr. DeWalt had been diagnosed with permanent paralysis from the chest down.  Mr. DeWalt's counsel asked Ohio Casualty to advise him of its policy limits and inform him of "your company's position regarding payment of same in order to avoid a bad faith claim."  Ex. A to Pl. Br. at 42.  Ohio Casualty responded in a letter dated September 24, 1998, informing Mr. DeWalt's counsel of the $25,000/$50,000 policy limits on the Guffey vehicle, but stating that it had a "policy limits problem on this matter," explaining that there were at least three claimants from the accident.  The letter stated that Ohio Casualty was still gathering information on the claimants and that as soon as it was in a position to discuss settlement, it would "be in touch."  Id. at 43.

By September 15, 1998, Ohio Casualty had already received correspondence from an attorney on behalf of Ms. Swinehart, enclosing medical bills totaling $45,502.81.  As of that time, however, Ohio Casualty had not been contacted by Mr. Fantini.  Def. Mot. and Pl. Reply at ¶¶ 11, 15.

-3-

Ohio Casualty's file log shows eight attempts to telephone Mr. Fantini between July 28, 1998 and August 10, 1998. A report in Ohio Casualty's claim file dated August 25, 1998, indicates an agent had spoken to Mr. Fantini's father, who was unable to give any detail about his son's injury. The agent asked Mr. Fantini's father to have his son contact the company, and a follow-up letter was sent, but no response had been received by the date of the report. The report also contains a note saying that the accident "appears to be a limits case." Ex. A to Pl. Br. at 821-22; Ex. B to Pl. Br. at 30-35, 712-14.

During the remainder of 1998, Mr. DeWalt's counsel provided Ohio Casualty with medical bills relating to Mr. DeWalt's treatment. There is no indication in the record that Mr. DeWalt's counsel made any further inquiries regarding settlement. In March of 1999, Ohio Casualty received medical bills from Ms. Swinehart's attorney showing that she had residual numbness in her right hand and left foot, but "all in all was doing quite well." Def. Mot. and Pl. Reply at ¶¶ 13-14, 18; Compl. at ¶ 20.

Ohio Casualty made no further attempt to contact Mr. Fantini between September 24, 1998, when it sent a letter asking him to contact the company, and March 17, 1999. On March 17, 1999, Ohio Casualty sent Mr. Fantini a letter informing him that it would handle the claims arising from the accident without his

-4-

involvement if Mr. Fantini did not respond in thirty days.  On that same day, in a letter that crossed Ohio Casualty's letter in the mail, counsel for Mr. Fantini wrote Ohio Casualty detailing Mr. Fantini's injuries, including facial disfigurement, and demanding $100,000 dollars in settlement.  Ohio Casualty responded by letter on April 26, 1999, rejecting his demand and informing Mr. Fantini's counsel of the $50,000/$25,000 policy limits and explaining that there were three claimants to the policy.  The letter also asked Mr. Fantini for additional documentation for his injuries.  The letter said that the company was waiting for additional medical records from one other claimant and that the company was not yet in a position to make a settlement offer.  Mot. and Pl. Reply at ¶ 23; Ex. D to Def. Mot. at 10; Ex. A to Pl. Br. at 38, 746.

On March 25, 1999, Ohio Casualty adjuster Gerald Todi put a note in the claims file stating that "this was probably a policy limits case."  On April 12, 1999, Ohio Casualty employee William Bottger sent an email to Ohio Casualty employee Glenn Cameron, saying he had reviewed the Guffey file and that it was an obvious "policy limits" case.  Mr. Cameron replied to the email, agreeing that this was a "policy limits" case, and saying that the limits had been reserved for some time.  Cameron further noted that releases could not be tendered until the company had received documentation from all claimants on the nature and

extent of their injuries, that the adjuster would attempt to work out an equitable division of the policy limits with the parties, and that if this failed, the company would consider filing an interpleader and depositing the policy limits with the court. Def. Mot. and Pl. Reply at ¶¶ 19-20; Ex. A to Pl. Br. at 39.

On April 26, 1999, Ohio Casualty wrote Ms. Guffey's father, its named insured, and informed him that the claims arising from the accident could exceed his policy limits. On May 4, 1999, Mr. Cameron entered a note to Ohio Casualty's file, again stating that the claim was a "policy limits" case. Def. Mot. and Pl. Reply at ¶¶ 20-21.

On June 17, 1999, Ohio Casualty sent a letter to counsel for all three claimants, advising them again of the policy limits and telling them that Ohio Casualty was willing to settle for those limits, if the three claimants could agree on a distribution. Counsel for Mr. Dewalt did not respond to this offer. Instead, on June 21, 1999, he filed suit against Ms. Guffey and her father for his injuries in the Court of Common Pleas for Northumberland County. Def. Mot. and Pl. Reply at ¶¶ 23-24

After Mr. DeWalt filed suit, Ohio Casualty employees made notes to the claim file on August 23, 1999, September 2, 1999, and September 7, 1999, suggesting the possibility of paying the policy limits into the court or filing an interpleader. On

September 23, 1999, Ohio Casualty wrote Mr. DeWalt's lawyer
advising him that it had settled the claims of Ms. Swinehart and
Mr. Fantini for $12,500 each and offering the remaining $25,000
of the policy to Mr. DeWalt.  Mr. DeWalt refused the offer and
proceeded to trial on his suit against the Guffeys.  Ohio
Casualty continued to offer the policy limits during the four
years the action was pending, but Mr. DeWalt continued to decline
those offers.  Def. Mot. and Pl. Reply at ¶¶ 25-30.

On August 12, 2003, Mr. DeWalt received a jury verdict
in his favor and against Ms. Guffey of over $4,000,000, later
amended to add delay damages.  On the same day as the jury
verdict, Ohio Casualty again offered its policy limits, which
were accepted.  Def. Mot. and Pl. Reply at ¶¶ 31-32.

After the jury verdict, Mr. DeWalt reached a settlement
agreement with Ms. Guffey.  Under the agreement, dated May 6,
2004, Mr. Guffey agreed to assign Mr. DeWalt her rights to a
cause of action for bad faith against Ohio Casualty.  In return,
Mr. DeWalt agreed to release his claims against Ms. Guffey for
the amount of the verdict in excess of the $50,000 policy limits,
amounting to over $4,200,000.  In addition, Mr. DeWalt agreed to
pay Ms. Guffey $1000, plus an additional $300 per month from the
signing of the agreement through the resolution of the bad faith
claim, not to exceed four years.  If the payments were to last

-7-

four years, they would amount to am additional $14,400.  Def.
Mot. and Pl. Reply at ¶¶ 33-34

On October 8, 2004, Mr. DeWalt sued Ohio Casualty in
the Court of Common Pleas for Northampton County, as assignee of
Ms. Guffey, bringing claims for breach of contract and bad faith.
The suit also brought a negligence claim against attorney Darryl
Wishard, Esq. and the law firm of Mitchell, Mitchell, Gray and
Callagher, the lawyers who had been retained by Ohio Casualty to
defend Ms. Guffey against Mr. DeWalt's lawsuit.  On January 18,
2006, the claim against Mr. Wishard and his law firm was
dismissed by stipulation, which created complete diversity of
citizenship between the plaintiff and the remaining defendant,
Ohio Casualty.  Ohio Casualty then timely removed the suit to
this Court, where it filed this motion to dismiss.  Def. Mot. and
Pl. Reply at ¶¶ 1-4 and Ex. A.


II.  <u>LEGAL ANALYSIS</u>

Bad faith by an insurance company can give rise to two
separate causes of action under Pennsylvania law:  a breach of
contract action for violation of an insurance contract's implied
duty of good faith and a statutory action under the terms of
Pennsylvania's bad faith law, 42 Pa. C.S. § 8371.  The plaintiff
has brought both claims here.

A    <u>Contract Actions for Bad Faith Under Pennsylvania Law</u>

Pennsylvania first recognized a contract action for bad faith in <u>Cowden v. Aetna</u>, 134 A.2d 223 (Pa. 1957).  In <u>Cowden</u>, an insurer had refused to participate in a litigation settlement between its insured and a third-party who had been injured in an automobile collision with the insured's truck.  The proposed settlement would have required the insurer to pay its policy limits in return for the third-party's release of all claims against the insured.  <u>Id.</u> at 224.  The proposed settlement therefore benefitted the insured by sparing him the risk of a verdict in excess of the limits of his insurance, but offered no benefit to the insurer, which would have paid the maximum amount under its policy and lost any chance for a verdict less than the policy limits.  After the settlement negotiations collapsed, the case proceeded to a verdict for the plaintiff for an amount $35,000 greater than the proposed settlement.  <u>Id.</u> at 227.  The insured then sued its insurer to recover the $35,000 excess verdict.  After a jury verdict for the insured, the trial court granted judgment notwithstanding the verdict to the defendant insurer.  <u>Id.</u> at 224.

Reviewing the case, the Pennsylvania Supreme Court for the first time recognized a cause of action for insurer bad faith under Pennsylvania law.  The court reasoned that there was the potential for a conflict of interest between an insurance company

-9-

and an insured in deciding whether to settle a claim at or near the policy limits.  Because both insurer and insured have "definite and separate interests in the disposition of such claims" which can become "substantially hostile" when a claim is unlikely to settle within the policy limits, the court reasoned that a insured must be required to "act with the utmost good faith toward the insured" when handling the litigation and settlement of claims.  Id. at 228.

In defining what this duty of good faith entails, the Pennsylvania Supreme Court held that the insurer must "consider in good faith the interest of the insured as a factor" in deciding whether or not to settle a claim and must "treat the claim as if [the insurer] were alone liable for the entire amount."  Id.  In setting this standard, the court cautioned that it was not creating an absolute duty for insurance companies to settle claims whenever a possible judgment against their insureds might exceed the amount of coverage, nor was it requiring insurance companies to submerge their interests and make the interest of their insureds paramount.  Rather, any decision not to settle within the limits of a policy must be made with "a bona fide belief by the insurer, predicated on all the circumstances of the case, that it has a good possibility of winning the suit" and any decision not to settle must be made honestly.  Id.  The court emphasized that evidence showing only "bad judgment" was

insufficient for liability and that "<u>bad faith and bad faith
alone</u> was the requisite to render the defendant liable." <u>Id.</u> at
229 (emphasis in original).  The court further held that an
insurer's bad faith must be proved by "clear and convincing
evidence." <u>Id.</u>

Applying these standards to the case before it, the
<u>Cowden</u> court upheld the trial court's decision to enter judgment
for the insurance company, notwithstanding the jury verdict of
bad faith.  The court found the evidence presented showed that
the insurer's decision not to tender its policy was the "honest,
considered judgment" of the company and its counsel and was
justified by a credible belief that the insured might be found
not liable. <u>Id.</u> at 476.

Subsequent decisions of the Pennsylvania Supreme Court
have clarified that the cause of action announced in <u>Cowden</u>
sounds in contract, not in tort, and that an insurer found guilty
of this cause of action will become "liable for the known and/or
foreseeable compensatory damages of its insured that reasonably
flow from the bad faith conduct of the insurer."[2] <u>Birth Center</u>

---

[2]   The <u>Cowden</u> decision, itself, is unclear as to whether the
bad faith action it recognizes sounds in tort or contract.  The
plaintiff in <u>Cowden</u> brought his action against his insurer in
trespass, not assumpsit, and the opinion, itself, seems to refer
to bad faith as both a tort and a contract claim.  <u>See id.</u> at 227
(liability for bad faith exists where insurer's handling of the
claim evinces bad faith in "the discharge of its contractual
duty," but noting that other jurisdictions have allowed recovery
for bad faith on grounds of "negligence, bad faith or fraud").

v. The St. Paul Companies, Inc., 787 A.2d 376, 379 (Pa. 2001).
When bad faith results in an excess verdict against an insured,
the insurer will become "liable regardless of the limits of the
policy for the entire amount of the judgment secured against the
insured." Gray v. Nationwide Mut. Ins. Co., 223 A.2d 8, 10 (Pa.
1966); see also Birth Center at 388.

    B.    Statutory Actions for Bad Faith under Pennsylvania Law

        In addition to the breach of contract action recognized
in Cowden, Pennsylvania also provides a statutory remedy for bad
faith, set out in 42 Pa. C.S. § 8371.  The Pennsylvania bad faith
statute permits an insured to recover interest, punitive damages,
court costs, and attorneys' fees for an insurance company's bad
faith:

        In an action arising under an insurance policy, if the
        court finds that the insurer has acted in bad faith
        toward the insured, the court may take all of the
        following actions:
        (1) Award interest on the amount of the claim from the
            date the claim was made by the insured in an
            amount equal to the prime rate of interest plus
            3%.
        (2) Award punitive damages against the insurer.
        (3) Assess court costs and attorney fees against the
            insurer.

--------------------------------------------------

Both Birth Center and Gray subsequently found that a common law
bad faith action sounds in contract.  Birth Center, 787 A.2d at
379; Gray, 223 A.2d at 11.

42 Pa. C.S. § 8371.   Section 8371 does not allow for the award
of compensatory damages, which if sought must be recovered under
other theories.  <u>Birth Center</u>, 787 A.2d at 386.

The statute was enacted in 1990 in response to a
Pennsylvania Supreme Court decision holding that Pennsylvania did
not recognize a common law action "in trespass for alleged bad
faith conduct of an insurer." <u>D'Ambrosio v. Pennsylvania Nat'l
Mut. Casualty Ins. Co.</u>, 431 A.2d 966, 970 (Pa. 1981)   In a
belated response to that decision, the Pennsylvania legislature
enacted 42 Pa. C.S. § 8371 nine years later.  <u>See</u> <u>Polselli v.
Nationwide Mut. Fire Ins. Co.</u>, 23 F.3d 747, 750 (3d Cir. 1994).

The nature and scope of § 8371 is still "unsettled" in
Pennsylvania law.  <u>Mishoe v. Erie Ins. Co.</u>, 824 A.2d 1153, 1161
n. 11 (Pa. 2003) (declining to address whether § 8371 sounds in
tort or contract or both).[3]  The statute, itself, never defines
"bad faith" or specifies what insurer actions will give rise to
liability, and the Pennsylvania Supreme Court has yet to address
the issue.  The United States Court of Appeals for the Third
Circuit has predicted that the Pennsylvania Supreme Court would
follow the two-prong test for liability set out by the
Pennsylvania Superior Court in <u>Terletsky v. Prudential Property &</u>

_____

[3]  The United States Court of Appeals for the Third Circuit
has predicted that, when the issue is addressed, the Pennsylvania
Supreme Court will find that § 8371 claims sound in tort.  <u>Haugh
v. Allstate Ins. Co.</u>, 322 F.3d 227, 235-36 (3rd Cir. 2003);
<u>Polselli</u>, 23 F.3d at 750.

Cas. Ins. Co., 649 A.2d 680, 689-90 (Pa. Super Ct. 1994).  See
Northwestern Mut. Life Ins. Co. v. Babayan, 430 F.3d 121, 137 (3d
Cir. 2005); Keefe v. Prudential Property and Cas. Ins. Co., 203
F.3d 218, 225 (3d Cir. 2000).

Terletsky reasoned that the term "bad faith" was a term
of art that had acquired a particular meaning in the context of
insurance law and applied the definition of the term in Black's
Law Dictionary:

> Insurance.  "Bad faith" on [the] part of [an] insurer is any
> frivolous or unfounded refusal to pay proceeds of a policy;
> it is not necessary that such refusal be fraudulent. For
> purposes of an action against an insurer for failure to pay
> a claim, such conduct imports a dishonest purpose and means
> a breach of a known duty (i.e., good faith and fair
> dealing), through some motive of self-interest or ill will;
> mere negligence or bad judgment is not bad faith.

Id., 649 A.2d at 688, quoting Black's Law Dictionary 139 (6th ed.
1990) (citations omitted).

From this definition, the Terletsky court set out a
two-part test, both elements of which a plaintiff must establish
by clear and convincing evidence:  The plaintiff must show (1)
that the insurer lacked a reasonable basis for denying coverage;
and (2) that the insurer knew or recklessly disregarded its lack
of a reasonable basis. Id., at 689-90; see also Babayan, 430 F.3d
at 137; Keefe, 203 F.3d 225.[4]

_____

[4]  Although the definition of "bad faith" adopted in
Terletsky refers to a "motive of self-interest or ill will," a
plaintiff is not required to establish that an insurer was
motivated by such an improper purpose.  Klinger v. State Farm

-14-

C.   <u>The Standards for Finding Bad Faith</u>

Both Ohio Casualty and Mr. DeWalt appear to agree that the same standard for bad faith applies to both the contract and the statutory causes of action in this case.  They differ, however, as to what that unitary standard should be.  Ohio Casualty argues that the two-part test set out in <u>Terletsky</u> governs both claims here.  Mr. DeWalt argues that <u>Terletsky</u> properly applies only to first party claims, like those for uninsured motorist coverage, but that "[i]n third party refusal to settle cases," like this one, "negligence is the applicable standard rather than the two part standard set forth in

_____

<u>Auto. Ins. Co.</u>, 115 F.3d 230, 233-24 (3d Cir. 1997).  The <u>Klinger</u> court, describing the definition set out in <u>Terletsky</u> as dicta, held that a plaintiff need only satisfy the two elements set out in the <u>Terletsky</u> opinion and declined to require a third element of improper purpose.  <u>Klinger</u>, 115 F.3d at 233.

<u>Terletsky</u>."[5]  <u>See</u> Pl. Br. at 8.[6]  Neither of these arguments

appears to be correct.


1.   The Standard for Liability in a Statutory Bad
     Faith Claim

The two-part standard set out in <u>Terletsky</u> defines the

scope of liability for a § 8371 claim.  <u>Babayan</u>, 430 F.3d at 137;

<u>Keefe</u>, 203 F.3d at 225.  Mr. DeWalt's suggestion that <u>Terletsky</u>

applies only to § 8371 actions concerning first party claims

finds no support in the case law.  Although Mr. DeWalt notes that

most of the cases that have applied the <u>Terlestky</u> standard have

---

[5]   A first party claim is one in which the insurer accused
of bad faith has refused to pay a benefit owed directly to the
insured under its insurance policy.  <u>See, e.g.</u>, <u>Poliselli</u>, 23
F.3d 747 (considering bad faith claim against insurer accused of
failing to pay property damage claims allegedly owed to insureds
under their own policies).  A third party claim is one in which
the insurer accused of bad faith has refused to pay a claim owed
to a third party because of the insured's actions.  <u>See, e.g.</u>,
<u>Birth Center</u>, 787 A.2d 376 (considering bad faith claim against
medical malpractice insurer accused of failing to settle third
party's personal injury claims arising out of insured's alleged
malpractice).

[6]   Mr. DeWalt's argument appears somewhat inconsistent.
Although he clearly states that he believes <u>Terletsky</u> should not
apply to third party refusal to settle cases like this one, he
also concedes that <u>Terletsky</u> "may be applicable with regard to
punitive damages," but should not be applied to compensatory
damages.  Pl. Br. at 8.  Because the statutory § 8371 cause of
action does not provide for compensatory damages, but only allows
punitive damages, interest, costs, and attorneys' fees, Mr.
DeWalt may be suggesting that <u>Terletsky</u> applies only to his
§ 8371 claim, but that his contract claim, which allows for
compensatory damages, is governed by negligence.  If this is, in
fact, what Mr. DeWalt is arguing, then, as explained elsewhere in
this opinion, the Court agrees.

-16-

involved first party claims, none of the cases he cites purports to limit <u>Terletsky</u> only to such cases, and nothing in <u>Terletsky</u> itself suggests such a limitation.[7]   Moreover, several decisions, including the <u>Schubert</u> opinion relied on in Mr. DeWalt's brief, have applied the <u>Terletsky</u> test in third party cases.   <u>See</u> <u>Schubert v. American Independent Ins. Co.</u>, No. 02-cv-6917, 2003 WL 21466915 at *4 (E.D. Pa. June 24, 2003) (applying the <u>Terlestky</u> test to the statutory cause of action in a third party excess verdict bad faith claim); <u>Adamski v. Allstate Ins. Co.</u>, 738 A.2d 1033, 1036 (Pa. Super. Ct. 1999) (applying <u>Terletsky</u> to determine if an insurer violated § 8371 in refusing to defend its insured against a third party claim).

    2.   The Standard for Liability in a Contract-Based Bad Faith Claim

        Having found that the <u>Terletsky</u> standard governs the statutory bad faith claim here, the Court turns to the standard governing the contract claim.   In its brief, Ohio Casualty assumes, without argument, that <u>Terletsky</u> governs this claim as well.   Although Ohio Casualty does not make it, there is a

---

    [7]   <u>See</u> Pl. Br. at 11-12, <u>citing</u> <u>Poliselli</u>, 23 F.2d 747; <u>Orrison v. Farmers New Century Ins. Co.</u>, No. 04-cv-1003, 2004 WL 1278018 (E.D. Pa. June 8, 2004); <u>Berks Mutual Leasing Corp. v. Travelers Property Cas.</u>, No. 01-cv-6784 2002 WL 31761419 (E.D. Pa. Dec. 9, 2002); <u>O'Donnell v. Allstate Ins. Co.</u>, 734 A.2d 901 (Pa. Super Ct. 1999); <u>MGA Ins. Co. v. Bakos</u>, 699 A.2d 751 (Pa. Super Ct. 1997); <u>Terletsky</u>, 649 A.2d 680.

logical argument supporting this position.  Both the contract
cause of action established in Cowden and the statutory cause of
action created by § 8371 are based on an insurer's "bad faith."
In creating its two-part test for the statutory claim, the
Terletsky court relied on the "particular meaning" that "bad
faith" has in the insurance context, as set out in Black's Law
Dictionary.  Id., 649 A.2d at 688.  Cowden similarly relied upon
a common understanding drawn from "the greatly preponderant
weight of authority in this country" in recognizing a claim for
bad faith.  Id., 134 A.2d at 227.  As both the Cowden and
Terletsky courts were drawing on the commonly understood meaning
of "bad faith" as a term of art in the insurance context, the
same definition of bad faith and therefore the same test for
liability might arguably apply in both.  This argument, however,
has no support in the controlling case law.

        Decisions in the Pennsylvania state courts and this
circuit have not applied the Terletsky standard to contract
claims for bad faith.  Birth Center, the most recent case in
which the Pennsylvania Supreme Court considered a bad faith
contract claim, does not cite Terletsky or reference its two-part
test.  787 A.2d 376.  Similarly, Haugh, the only decision in the
United States Court of Appeals for the Third Circuit to consider
an excess verdict bad faith claim after Terletsky,  neither cites

the case nor applies its test.  322 F.3d 227.  <u>Terletsky</u>
therefore appears limited to claims brought under § 8371.

Pennsylvania law, although clear that <u>Terletsky</u> does
not apply to bad faith claims based in contract, is unclear as to
what the standard should be for such claims.  Neither the
Pennsylvania state courts nor the courts of this circuit have set
out an explicit definition of "bad faith" for contract actions
based on <u>Cowden</u> or articulated the elements for such claims

<u>Cowden</u> remains the best articulation of the showing of
"bad faith" necessary to impose liability based in contract on an
insurer for failure to settle a case resulting in an excess
verdict.  <u>See</u> <u>Puritan Ins. Co. v. Canadian Univ. Ins. Co., Ltd.</u>,
775 F.2d 76, 79 (3d Cir. 1985) (standard of care owed by a
carrier to its insured in handling settlement matters is stated
in <u>Cowden</u>); <u>United States Fire Ins. Co. v. Royal Ins. Co.</u>, 759
F.2d 306, 310 (3d Cir. 1986) (looking to <u>Cowden</u> to determine the
standard of care owed by an insurer in an excess verdict case).[8]

--------

[8]  The most recent decision in the U.S. Court of Appeals for
the Third Circuit to consider the showing necessary to prevail on
a contract claim for bad faith does not look to <u>Cowden</u>.  <u>Haugh</u>,
32 F.2d at 237.  The <u>Haugh</u> court instead relies on an
intermediate state appellate court opinion that addressed the
same specific factual issue presented in the case.  In pertinent
part, <u>Haugh</u> concerned an insurer's argument that it was entitled
to summary judgment because the evidence showed it had conducted
a reasonable investigation of the third-party claim against its
insured before deciding not to settle it.  The <u>Haugh</u> court held
that, even if the insurer's investigation was reasonable,
"Pennsylvania law . . . requires more," relying on a Pennsylvania
Superior Court decision that held that an insurer must consider

Under Cowden, an insured "must accord its insured the same faithful consideration it gives its own interest." Id., 134 A.2d at 228.  Any decision to expose an insured to a potential excess verdict, "must be based on a bona fide belief by the insurer, predicated upon all of the circumstances of the case, that it has a good possibility of winning the suit."  Id.; see also Haugh, 322 F.3d at 238.  For an insurer to have acted in good faith in refusing to settle, the chance of a finding of non-liability must be real and substantial and the decision to litigate must be made honestly.  Id. at 228.  This means that the sincerity of an insurer's belief is not sufficient to defeat a bad faith claim.  U.S. Fire, 759 F.3d at 310.

Cowden is unclear whether negligence on the part of an insurer is enough to create a bad faith claim, or whether a higher showing of recklessness or intentionality is required.  There are several suggestions in the opinion that negligence can constitute bad faith.  The Cowden plaintiff's claim was, in part, one for negligence, alleging that the insurer was "negligent,

---

all the factors bearing upon the advisability of settlement, including the anticipated range of the verdicts, the weight of the available evidence, and the relative appeal of the parties. Id., 32 F.3d at 237-38, citing Shearer v. Reed, 428 A.2d 635 (Pa. Super. Ct. 1981).  As it was disputed whether the insurer in Haugh had properly considered these additional factors in refusing settlement, the Haugh court held summary judgment was inappropriate.  The court also held that the insured's failure to notify the insured of significant settlement negotiations and the existence of a settlement offer also provided grounds for a finding of bad faith.  Id. at 238.

willful, reckless and [showed] fraudulent disregard" in failing
to settle within the policy limits.  Id. 134 A.2d at 234.  In
addition, in its review of other jurisdictions' decisions on bad
faith, the Cowden court noted that "almost all the authorities
are agreed that an insured may recover from his insurer,
regardless of policy limitations, on the ground of negligence,
bad faith or fraud in the insurer's conduct in respect of its
responsibility."  Id. at 237.  Elsewhere in the opinion, however,
the Cowden court appears to say that "bad faith" requires
something more than mere negligence, stating that "bad faith and
bad faith alone was the requisite to render the defendant liable"
and that "bad judgment, if alleged, would not have been
actionable."  Id. at 229 (emphasis in original).

        Given the distinction Cowden makes between actionable
"bad faith" and mere "bad judgment," Cowden appears to be
requiring something more than negligence for a finding of bad
faith.  Subsequent Pennsylvania Supreme Court decisions, however,
have stated in dicta that negligence or unreasonableness in
investigating a claim or refusing an offer of settlement can
constitute bad faith.  See Geodeon v. State Farm Mut. Auto. Ins.
Co., 188 A2d 320, 322 (Pa. 1963) (An insurer undertaking the
defense of an insured must act "with due care in representing the
interests of the insured" and if it "is derelict in this duty, as
where it negligently investigates the claim or unreasonably

-21-

refuses an offer of settlement, it may be liable regardless of the limits of the policy for the entire amount of the judgment secured against the insured."); <u>Gray</u>, 223 A.2d at 9-10 (same).

The United States Court of Appeals for the Third Circuit has also described the bad faith standard under <u>Cowden</u> as negligence:  "Pennsylvania law makes clear that an insurer may be liable [for bad faith] . . . if it unreasonably refuses an offer of settlement."  <u>Haugh</u>, 322 F.3d at 237 (internal quotations and citations omitted); <u>see also</u> <u>Schubert</u>, 2003 WL 21466915 at *4 (denying summary judgment on a bad faith contract claim where the evidence permitted a jury to find that the insurance company had acted unreasonably in declining a settlement offer); <u>Clark v. Interstate National Corp.</u>, 486 F. Supp. 145, 146-49 (E.D. Pa. 1980) (finding no error in a jury charge permitting the imposition of bad faith liability if the jury found negligence), <u>aff'd without op.</u>, 636 F.2d 1207 (3d Cir. 1980).  Given the <u>Haugh</u> decision, the Court concludes that the controlling interpretation of <u>Cowden</u> in this circuit is that a contract claim for bad faith requires evidence that an insurer acted negligently or unreasonably in handling the potential settlement of claims against its insured.

D.   The Sufficiency of the Evidence of Defendant Ohio
     Casualty's Bad Faith

Having determined that separate standards for bad faith govern the statutory and contract claims for bad faith here, the Court can now evaluate Ohio Casualty's motion for summary judgment.

Summary judgment is appropriate if the pleadings and other evidence on the record "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In evaluating the evidence, the court must view the facts in the light most favorable to the non-moving party and draw all reasonable inferences from those facts in the non-movant's favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).  The Court, however, is also "required to take any heightened standard of proof into account" in deciding a motion for summary judgment.  Babayan, 430 F.3d at 129.  Here, because both the statutory and contract claims for bad faith must be proven by clear and convincing evidence, Mr. DeWalt's burden "in opposing a summary judgment motion brought by the insurer is commensurately high because the court must view the evidence presented in light of the substantive evidentiary burden at trial."  Id. at 137.

Ohio Casualty has raised essentially two separate arguments in support of its summary judgment motion.  In its initial memorandum in support of its motion, it argues that the

facts established in this case fail to show that it acted in bad faith, and that no reasonable jury could find that its actions in investigating the claim and collecting complete medical records from all injured parties before making a settlement offer were unreasonable.  In its reply memorandum, Ohio Casualty raises an additional argument, contending that, under Pennsylvania law, an insurer cannot be liable for an excess verdict bad faith claim unless it has expressly refused to settle a claim, and that here Ohio Casualty never refused to settle with Mr. DeWalt.  The Court will address Ohio Casualty's second argument first.

> 1     Pennsylvania Law Does Not Require that an Insurer Refuse to Settle a Claim Before It Can be Found Liable for an Excess Verdict.

Ohio Casualty argues that a bad faith action "arises only when an insurer <u>actually refuses</u> to pay some benefit due under the policy."  Def. Rep. Br. at 4 (emphasis in original).  Because Ohio Casualty never refused to settle with Mr. DeWalt, it contends it cannot be liable here.  In support of this argument, Ohio Casualty cites cases in which insurers were found to have committed bad faith by refusing to settle.  <u>Id.</u> <u>citing</u> <u>Schubert</u>, 2003 WL 21466915, <u>Clark</u>, 486 F. Supp. 145; <u>Birth Center</u>, 567 Pa. 386; <u>Cowden</u>, 134 A.2d 223.

Ohio Casualty's argument is misplaced.  Nothing in Pennsylvania law suggests that an insurer must refuse to settle a

claim before it can be found to have acted in bad faith. Although most Pennsylvania cases finding bad faith do so in situations where an insurer refuses to settle, no case suggests that such a refusal is a pre-requisite for a bad faith claim. To the contrary, at least one case applying Pennsylvania law has held that, in appropriate circumstances, an insurer who delays in accepting a settlement offer, but never refuses to settle, may nonetheless be liable for bad faith. See, e.g., Schubert, 2003 WL 21466915 at *1, *3.

In Schubert, an insurance company representing an insured against a third party claim responded to a settlement offer with a request that the third party undergo an independent medical examination. The third party refused, the case failed to settle, and the claimant ultimately obtained a judgment in excess of the policy limits. Ruling in the subsequent bad faith case on the insurance company's motion for summary judgment, the Schubert court held that the insurance company could be liable for bad faith under Cowden, but not under the higher standard for statutory bad faith set out in Terletsky. Id. at *3, *5; see also Puritan Ins. Co., 775 F.2d at 82 (reversing the district court's finding that an insurance company had an affirmative duty to initiate settlement negotiations, but suggesting that "an insurance carrier may be required to broach settlement negotiations under some circumstances").

    2    Ohio Casualty's Conduct Does Not Satisfy the Standard for either a Statutory or a Contract-Based Bad Faith Claim.

Ohio Casualty's principal argument is that its actions with respect to its defense of the claims against its insured, Ms. Guffey, do not rise to the level of bad faith.  Mr. DeWalt, as Ms. Guffey's assignee, contends that they do and points to multiple failings that he contends constituted bad faith.  After reviewing the record in the light most favorable to Mr. DeWalt and giving him the benefit of all reasonable inferences, the Court concludes that there is insufficient evidence to allow a reasonable jury to find, with the requisite clear and convincing standard of proof, that Ohio Casualty committed bad faith under either the plaintiff's contract or statutory causes of action.

    a    No bad faith in declining to offer policy limits before obtaining information on other claimants

Mr. DeWalt argues that Ohio Casualty should have tendered its policy limits to him after it received the September 15, 1998, letter from his counsel, asking what its policy limits were and asking its position on tendering them.  At that time it is undisputed that Ohio Casualty knew that Mr. DeWalt had been paralyzed by the accident and understood that Mr. DeWalt's claim for his injuries would exceed the individual limit on Ms.

-26-

Guffey's policy.  Mr. DeWalt contends that Ohio Casualty's response to his counsel's letter, stating that it could not make a settlement offer to Mr. DeWalt because it was still gathering information on the other injured passengers, was unreasonable and in bad faith because Ohio Casualty could have offered him its policy limits without prejudicing the other two potential claimants:  "Paying the single person limit for a quadriplegic would not have deprived either of the lesser-injured claimants from theoretically receiving the full limit as well."  Pl. Br. at 15.

Mr. DeWalt's argument, however, is factually mistaken. Because of the structure of Ms. Guffey's policy and the number of potential claimants, Ohio Casualty could not have offered Mr. DeWalt the maximum amount available under the policy without reducing the amount available to the other two potential claimants.  Ms. Guffey's policy provided for coverage for personal injuries of $50,000 per accident and $25,000 for each individual injured.  Given these limits, if Ohio Casualty had offered Mr. DeWalt the $25,000 individual maximum under the policy, it would have left only $25,000 to split between the other two injured passengers, Ms. Swinehart and Mr. Fantini. Ohio Casualty therefore could not offer Mr. DeWalt its policy limits without reducing the amount it could offer the other two potential claimants.

Reducing the amount available to settle Ms. Swinehart and Mr. Fantini's claims before Ohio Casualty had sufficient information to evaluate them would have been unreasonable.  Here, even from the limited information Ohio Casualty had available to it in September 1998, it knew that Ms. Swinehart's claim for her injuries would be greater than the $25,000 individual coverage limit.  By that time, Ohio Casualty knew Ms. Swinehart had suffered a broken neck and had received partial medical bills from her lawyer amounting to over $45,000.  Although Ohio Casualty had less information about Mr. Fantini because he had not yet responded to their attempts to communicate with him, it knew from the initial report on the accident that he had suffered facial injuries (which ultimately were sufficiently serious to lead him to demand $100,000 to settle his claim).  In the face of this knowledge, had Ohio Casualty offered its policy limits to Mr. DeWalt and reduced the amount available to Ms. Swinehart and Mr. Fantini, it would have knowingly exposed its insured, Ms. Guffey, to the risk of having an insufficient amount remaining in the policy to settle the latter two claims.  Pennsylvania law does not require Ohio Casualty to risk acting in bad faith with respect to the claims of Ms. Swinehart and Mr. Fantini in order to avoid being accused of acting in bad faith with respect to Mr. DeWalt.

The authority Mr. DeWalt cites in support of his argument is unpersuasive.  He cites Schubert v. American Independent Ins. Co., 2003 WL 21466915 (E.D. Pa. June 24, 2003) and Clark v. Interstate National Corp., 486 F. Supp. 145 (E.D. Pa. 1980).  In both cases, an insurance company declined an offer to settle a third party claim because the insurer contended it needed additional information.  The Schubert court refused to grant summary judgment to an insurer accused of bad faith where the insurer had responded to a settlement offer with a request to have the claimant undergo an independent medical examination. Schubert at *4.  The Clark court upheld a bad faith jury verdict against an insurance company which had declined numerous offers to settle within its policy limits on the ground that it needed additional information to evaluate the claimant's preexisting medical conditions. Clark at 146.  Neither case addresses the reasonableness of requiring additional information in a situation like this one, where several claimants exist to the same policy and where the tender of the individual policy limits to any one claimant would reduce the amount available to the others.

In addition, in both Schubert and Clark, the insurer insisted on additional investigation in the face of an offer to settle by the third party claimant.  Here, in contrast, Mr. DeWalt never made an offer to Ohio Casualty to settle his claims. Although Mr. DeWalt refers to his counsel's September 15, 1998,

letter to Ohio Casualty as a settlement "demand," that letter only asked Ohio Casualty what its policy limits were and what its position was on tendering them to Mr. DeWalt "to avoid a bad faith claim."  Even giving Mr. DeWalt the benefit of every reasonable inference, the letter cannot be construed as an offer to settle Mr. DeWalt's case for Ohio Casualty's policy limits, particularly since the letter makes clear that Mr. DeWalt's counsel did not know what those limits would be.

> b    No bad faith in the delay in obtaining
>      medical records from the other two potential
>      claimants.

Mr. DeWalt argues that Ohio Casualty committed bad faith by unreasonably delaying its investigation into Ms. Swinehart and Mr. Fantini's claims.  The accident occurred on July 28, 1998, but Ohio Casualty did not tender its policy limits to the three claimants until June 17, 1999, and did not make a separate offer to Mr. DeWalt of the individual policy limits until September 23, 1999.  Ohio Casualty disputes Mr. DeWalt's characterizations of its actions as delay and contends that it acted reasonably and not in bad faith.

An insurer's delay in settling a claim may, in some circumstances, constitute bad faith.  Klinger, 115 F.3d at 232-33.  Those courts to have considered the issue have held that delay alone cannot constitute bad faith under Pennsylvania law,

unless there is evidence to show the insurer knows its delay to be baseless and unreasonable.  <u>See, e.g.</u>, <u>Klinger</u> at 234 (finding bad faith from delay where the evidence showed the insurer "knew or recklessly disregarded the fact it had no reasonable basis" for delaying the payment of the claim); <u>Kosierowski v. Allstate Ins. Co.</u>, 51 F. Supp.2d 583, 588-89 (E.D. Pa. 1999) (a "long period of time between demand and settlement does not, on its own, necessarily constitute bad faith"; courts look to whether an insurer "knew that it had no basis to deny the claimant"), <u>aff'd without op.</u>, 234 F.3d 1265 (3d Cir. 2000); <u>Hollock v. Erie Ins. Exchange</u>, 842 A.2d 409, 413, 418 (Pa. Super. Ct. 2004).  Delay that is attributable to the need to investigate further or to simple negligence is not bad faith.  <u>See</u> <u>Kosierowski</u> at 589.

All of these cases, however, concern statutory bad faith claims brought under § 8371 and are therefore decided under the heightened <u>Terletsky</u> standard requiring that a plaintiff show both that an insurer lacked a reasonable basis for its actions and that it either knew or recklessly disregarded that lack.  No case cited by the parties or found by the Court addresses the circumstances under which delay can be bad faith in a contract-based claim subject to the negligence or reasonableness standard set out in <u>Cowden</u> and <u>Haugh</u>.

Because negligence alone can be sufficient to support a bad faith contract claim, the Court believes that the reasoning

of <u>Kosierowski</u> and similar cases -- stating that delay
constitutes bad faith only if it is deliberate and knowing and
that delay due to negligence is not bad faith -- is correct only
as to claims brought under § 8371.  For bad faith claims based in
contract, where the governing standard is one of due care, the
Court concludes an insurer's delay may constitute bad faith if it
is unreasonable or the result of negligence.

i.   <u>Statutory bad faith</u>

Applying these standards, the Court concludes that any
delay in Ohio Casualty's handling of these claims cannot support
a bad faith claim under § 8371.  From the factual record before
the Court, there is no evidence suggesting that Ohio Casualty
deliberately or knowingly delayed settling any of the claims
against Ms. Guffey.  Ohio Casualty's internal claim files and
correspondence show that its adjusters consistently reported that
the claims against Ms. Guffey would exhaust its policy limits,
but that Ohio Casualty needed medical records from all claimants
before it could propose a settlement offer tendering those
limits.  No evidence has been presented that suggests Ohio
Casualty deliberately delayed collecting these records or that
Ohio Casualty had no basis for requesting them.  To the contrary,
as discussed above, under these circumstances, failing to

investigate the claims of all three claimants before making a settlement offer would itself have been unreasonable.

### ii.   Contract-based bad faith

The Court also concludes that the delay in settling these claims does not support a contract-based claim for bad faith under Cowden.  No reasonable jury could find by clear and convincing evidence that the time taken by Ohio Casualty in processing these claims was unreasonable or negligent.  In reaching this conclusion, the Court finds instructive the case of Wiedinmyer v. Harlesyville Mut. Ins. Co., 42 Pa. D. & C. 4th 204 (Mont. Co. C.C.P. 1999), aff'd without opinion, 760 A.2d 442 (Pa. Super Ct. 2000).

Like this case, Wiedinmyer involved an auto accident that injured several people.  The plaintiff alleged that an insurer committed bad faith by failing to investigate and process quickly his claim for under-insured motorist benefits and by failing to offer him a prompt settlement.  The insurer defended its actions by arguing that it had needed time to investigate the claims of another claimant to the policy and that "neither claim could be settled without taking into account the rights of the other claimant."  Id. at 206.  The Wiedinmyer court granted the insurer summary judgment, applying the Terletsky factors for a statutory § 8371 claim.  The court found that the "apparent

delays in processing plaintiff's claim resulted largely from the need to collect documentation from multiple parties and the need to coordinate settlement between two parties making claims upon the same single limit policy." Id. at 212.  Central to the court's reasoning was the fact that the delay could not be entirely attributed to the defendant, but was caused in part by the claimants.  Although the court found it could "conceivably be argued that the defendant was negligent in failing to more actively pursue settlement" after the plaintiff made a demand or in failing to more forcefully press the claimants to negotiate a distribution of the policy, this could not, without more, constitute bad faith.  Id. at 217, 220.

Although Wiedinmyer concerned a § 8371 claim and applied the Terletsky standard, the Court believes that its reasoning applies here to Mr. DeWalt's contract claim under Cowden.  Even more than in Wiedinmyer, any delay here was primarily attributable to the actions of the other claimants to the policy, not to Ohio Casualty.  As of September 15, 1998, when Mr. DeWalt first inquired as to the policy limits, Ohio Casualty had not received complete medical records from any of the three claimants to its policy.  The record shows that Mr. DeWalt provided his medical records to Ohio Casualty before the end of 1998.  Ms. Swinehart, although she provided partial medical records before September 15, 1998, did not provide additional

medical records until March 1999.  Mr. Fantini, despite at least ten attempts by Ohio Casualty to contact him in August and September 1998, did not communicate with Ohio Casualty until March 1999 and was requested to provide additional documentation for his claim on April 26, 1999.   On June 17, 1999, after receiving records from all three claimants, Ohio Casualty offered to settle for its policy limits, if the claimants could agree on a distribution.  Four days later, Mr. DeWalt filed suit without responding to the offer.  On September 23, 1999, after having reached settlements with Ms. Swinehart and Mr. Fantini that were sufficiently below the policy limits to leave $25,000 available under the policy for Mr. DeWalt, Ohio Casualty tendered him its individual policy limit.

     From this record, the Court does not believe any reasonable jury could find that Ohio Casualty acted unreasonably or negligently in investigating these claims or in negotiating with the claimants.  Most of the eleven month delay between the July 28, 1998, accident and Ohio Casualty's June 17, 1999, settlement offer was due to the delay by Mr. Fantini (and to a lesser extent by Ms. Swinehart) in providing medical records to Ohio Casualty.  Ms. Swinehart did not provide full medical records until March 1999 and Mr. Fantini until sometime after April 26, 1999.

Although Mr. DeWalt argues that Ohio Casualty should have more aggressively pursued records from Ms. Swinehart and Mr. Fantini, there is no evidence in the record to support an inference that any additional efforts by Ohio Casualty would have prompted a faster response from these claimants.  The last claimant to contact Ohio Casualty, Mr. Fantini, did so after ignoring the insurer's repeated attempts to contact him in August and September 1998 and before receiving Ohio Casualty's March 1999 ultimatum to contact the insurer or risk having the policy divided without him.  On these facts, there is no basis for an assumption that more aggressive attempts to contact Mr. Fantini or an earlier ultimatum would have spurred him to respond more quickly.

In finding that, on these facts, Ohio Casualty is not responsible for delay caused by Ms. Swinehart and Mr. Fantini, the Court is not suggesting that insurers cannot be liable for bad faith when delay is caused by third parties under different circumstances.  A third party's delay in providing medical records that in turn delayed settling a claim might not prevent a finding of bad faith if the insurer lacked a reasonable basis for requesting those records or if the insurer lacked a reasonable basis to postpone pursuing settlement until they were received. An insurer might also become responsible for a third party's delay by actively or tacitly encouraging it, or by negligently or

unreasonably failing to pursue the requested third party
information diligently.  If a third party's delay proves
intractable, an insurer may have a duty to issue an ultimatum and
proceed to settle the claim without the third party's input and
may be guilty of bad faith if it fails to do so.

None of these hypothetical circumstances, however,
exists in this case.  The Court therefore finds insufficient
evidence here to show that the delay in settling the claims
against Ms. Guffey constituted bad faith by Ohio Casualty under
either applicable standard.

> c   No bad faith in failing to communicate with
>     Ms. Guffey.

Mr. DeWalt also contends that Ohio Casualty committed
bad faith by failing to keep Ms. Guffey informed about the
progress of its investigation into the claims against her, and in
particular, by not notifying her of the possibility that the
claims against her might exceed her coverage until April 26,
1999.  Mr. DeWalt has submitted an expert report of James N.
Chett who states that these failures violated both insurance
industry standards and a Pennsylvania insurance regulation.  That
regulation states that, if an investigation into a claim cannot
reasonably be completed within 30 days, then at that time and
every 45 days thereafter, the insurer "shall provide the claimant
with a reasonable written explanation for the delay and state

when a decision on the claim may be expected."  31 Pa. Code
§ 146.6.

Ohio Casualty has not disputed that it did not provide
Ms. Guffey with updates as to the status of its investigation and
did not notify her of the possibility of an excess verdict until
April 26, 1999.  Ohio Casualty's brief does not address whether
its actions in this regard fell below industry standards or
violated Pennsylvania regulations, and for purposes of this
motion, this Court will therefore assume that they did.  Instead,
Ohio Casualty argues that its alleged deficiencies in its
communications with its insured cannot support a bad faith claim
because those deficiencies did not cause the excess verdict that
the plaintiff seeks to recover.  The Court agrees with Ohio
Casualty.

In a bad faith case, an insurer is liable only "for the
known and/or foreseeable compensatory damages of its insured that
reasonably flow from the bad faith conduct of the insurer."
Birth Center, 787 A.2d at 379.  To recover for an excess verdict,
therefore, a plaintiff must show that the verdict was a known or
reasonably foreseeable result of the insurer's bad faith.  Where
an insurer's bad faith conduct consists of a failure to
communicate with its insured, the plaintiff cannot maintain a
claim unless there is sufficient evidence to allow a jury to
conclude that the lack of communication in some way caused the

-38-

excess verdict.  See Schubert, 2003 WL 21466915 at *3; c.f. Haugh, 322 F.3d at 238.

In Schubert, the plaintiff's excess verdict bad faith claim was based, in part on his insurer's failure to communicate a third party's settlement offer to him.  The court held that the failure to communicate, although it could be evidence of whether the insurer "had the insured's interests in mind," could not in itself constitute bad faith.  The Schubert court reasoned that, under Cowden, an excess verdict bad faith case arises from the alleged unreasonableness of the insurer's decision to not settle and that therefore, unless there is evidence that the insurer's failure to communicate contributed to the rejection of the settlement, the failure does not constitute actionable bad faith. Finding that the plaintiff had presented only "hypothetical" and speculative arguments to connect the insurer's failure to communicate with the failure to settle, the court found the claim could not be maintained.  Id. at *3.

Haugh also concerned an allegation that an insurer committed bad faith by failing to inform its insured of a settlement offer.  The court held that this failure could be "evidence of bad faith" because it represented a violation of the insurer's duty "to reasonably inform the insured of significant developments bearing on the settlement of claims against the insured."  Id. at 238.

-39-

Here, even assuming that Ohio Casualty's failure to communicate with Ms. Guffey violated its procedures and Pennsylvania regulations, that failure does not constitute actionable bad faith.  Mr. DeWalt has not presented any argument, not even a "hypothetical" one of the kind found insufficient in Schubert, to show that Ohio Casualty's lack of communication with Ms. Guffey contributed to the ultimate failure to settle his claim.  Nothing in the evidence before the Court suggests that there was any connection between the deficiency of Ohio Casualty's communications with Ms. Guffey and the failure to settle with Mr. DeWalt.

Such a connection is particularly improbable here because, unlike Haugh and Schubert, this case does not involve an insurer's failure to communicate a settlement offer to an insured.  As discussed elsewhere in this Memorandum, Mr. DeWalt never offered to settle his claim against Ms. Guffey, but only inquired about the limits of the policy.  In the absence of any evidence or argument that would allow a jury to find Ohio Casualty's failure to communicate with Ms. Guffey contributed to the ultimate excess verdict, this failure cannot constitute bad faith.

III. <u>CONCLUSION</u>

        Mr. DeWalt has failed to present sufficient evidence to allow a reasonable jury to conclude that Ohio Casualty acted in bad faith toward its insured, Ms. Guffey, under the standards applicable to either Mr. DeWalt's statutory or contract-based cause of action.  The Court will therefore grant Ohio Casualty's Motion for Summary Judgment as to both claims.

        An appropriate Order follows.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA


JOHN DEWALT, assignee of     :     CIVIL ACTION
BETTY JO GUFFEY, now          :
BETTY JO GUFFEY GOSS          :
                              :
              v.              :
                              :
THE OHIO CASUALTY             :
INSURANCE COMPANY             :     NO. 05-740


ORDER

AND NOW, this 10th day of April, 2007, upon
consideration of the Defendant's Motion for Summary Judgment
(Docket No. 8), and the plaintiff's response, IT IS HEREBY
ORDERED that the Motion is GRANTED for the reasons set forth in
the accompanying memorandum.  Judgment is hereby entered for the
defendant The Ohio Casualty Insurance Company and against the
plaintiff John DeWalt.

This case may be closed.


BY THE COURT:


/s/ Mary A. McLaughlin
MARY A. McLAUGHLIN, J.